**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Keith D. Goodman, | : | Case No. 4:13 CV 1318 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| Defendant, | : | **RECOMMENDATION** |

**I. INTRODUCTION**

Plaintiff Keith D. Goodman ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and 423 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 14 and 17). For the reasons that follow, the Magistrate recommends that the decision of the Commissioner be

1

affirmed.

## II. PROCEDURAL BACKGROUND

On May 18, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 13, p. 126 of 1088). In his application, Plaintiff alleged a period of disability beginning May 10, 2006 (Docket No. 13, p. 126 of 1088). Plaintiff's claim was denied initially on February 22, 2010 (Docket No. 13, p. 89 of 1088), and upon reconsideration on February 23, 2011 (Docket No. 13, p. 96 of 1088). Plaintiff thereafter filed a timely written request for a hearing on March 14, 2011 (Docket No. 13, p. 103 of 1088).

On April 18, 2012, Plaintiff appeared with counsel for a hearing before Administrative Law Judge James A. Hill ("ALJ Hill") (Docket No. 11, pp. 44-86 of 1088). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 11, pp. 79-86 of 1088). ALJ Hill found Plaintiff to have a severe combination of coronary artery disease, diabetes, diabetic retinopathy, obstructive sleep apnea, cervical disc displacement, and loss of vision in the left eye with an onset date of May 10, 2006 (Docket No. 13, p. 30 of 1088).

Despite these limitations, ALJ Hill determined, based on all the evidence presented, that Plaintiff had not been under a disability within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision, May 4, 2012 (Docket No. 13, p. 37 of 1088).[1] ALJ Hill found Plaintiff had the residual functional capacity to perform light work with the following additional limitations: (1) no climbing of ladders, ropes, or scaffolds, or concentrated exposure to fumes, odors, dusts, gases, or poor ventilation; (2) only occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; (3) no job requiring depth perception of wide visual fields; (4) no commercial driving;

---

[1]During the administrative hearing, discussion occurred as to whether the onset date should be amended to May 2, 2009 (Docket No. 13, p. 52 of 1088)

and (5) no exposure to moving machinery and unprotected heights (Docket No. 13, p. 32 of 1088). Plaintiff's request for benefits was therefore denied (Docket No. 13, p. 37 of 1088).

On June 14, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of DIB (Docket No. 1). In his pleading, Plaintiff alleged that the ALJ erred by determining that Plaintiff could return to his past relevant work (Docket No. 14). Defendant filed its Answer on September 3, 2013 (Docket No. 12).

### III.  FACTUAL BACKGROUND

**A.    ADMINISTRATIVE HEARING**

An administrative hearing convened on April 18, 2012, in Akron, Ohio (Docket No. 13, pp. 33-86 of 1088). Plaintiff, represented by counsel John A. McNally, III, appeared and testified (Docket No. 13, pp. 50-79 of 1088). Also present and testifying was VE Gene Burkhammer ("VE Burkhammer") (Docket No. 13, pp. 79-86 of 1088).

**1.    PLAINTIFF'S TESTIMONY**

At the time of the hearing, Plaintiff was fifty-six years old and residing with his girlfriend (Docket No. 13, pp. 50, 70 of 1088). Plaintiff attended four years of college at Indiana University but did not earn a degree (Docket No. 13, p. 51 of 1088). Plaintiff testified that he most recently worked as a stockbroker and insurance salesman, although he indicated that he had not worked since May 2, 2009 (Docket No. 11, pp. 53, 57, 61 of 1088). Plaintiff stated that he had a driver's license, but, given his reduced vision, could only drive short distances (Docket No. 13, p. 51 of 1088). When asked what prevented him from returning to work, Plaintiff cited his long-term heart and vision issues (Docket No. 13, pp. 58-59 of 1088).

Plaintiff gave in-depth testimony concerning these impairments, beginning with his heart issues. Plaintiff stated that, since 1989, he has had eight total heart procedures, including stent placement and rotoblator surgeries (Docket No. 13, p. 58 of 1088). His most recent surgery was a quadruple bypass in July 2009 (Docket No. 13, p. 66 of 1088). Although he noted that his heart condition had improved, Plaintiff also testified that he

3

cannot lift heavy objects, experiences shortness of breath, and sometimes has difficulty standing (Docket No. 13, p. 67 of 1088). Plaintiff indicated that he suffered from angina, even after the bypass surgery (Docket No. 13, p. 76 of 1088).

Plaintiff also gave testimony about his vision difficulties, which include a diagnosis of diabetic retinopathy (Docket No. 13, p. 67 of 1088), blood clots behind his optic nerve as a result of atrial fibrillation[2] ("A-fib") (Docket No. 13, p. 69 of 1088), and possible optic neuritis[3] (Docket No. 13, p. 70 of 1088). Plaintiff stated that he can see shadows out of his left eye but, for all practical intents and purposes, is blind in that eye (Docket No. 13, p. 69 of 1088). Plaintiff's vision in his right eye is considerably better (Docket No. 13, p. 69 of 1088). Plaintiff stated that he can see pictures and big print, but cannot read something that is written in twelve-point font (Docket No. 13, p. 69 of 1088). He also testified that his vision will be fine for three or four days but then ceases altogether for periods of ten seconds to five hours, leaving him "completely, totally blind."  Plaintiff also testified that he experienced memory loss and psychiatric problem  (Docket No. 13, pp. 70, 77 of 1088)

As for daily activities, Plaintiff stated that he wakes up around 8:30, takes his medication, makes breakfast, watches television, and goes for walks (Docket No. 13, pp. 72, 74 of 1088). He also tries to read, but indicated that he has some difficulty due to his vision problems (Docket No. 13, p. 73 of 1088). Plaintiff testified that he can walk two or three miles (Docket No. 13, p. 67 of 1088), engage in fine manipulation such as using a keyboard or writing (Docket No. 13, p. 67 of 1088), bend, stoop, and squat (Docket No. 13, p. 67 of 1088), and lift twenty pounds (Docket No. 13, p. 70 of 1088). Plaintiff stated that he does some of the household chores (Docket No. 13, p. 70 of 1088). He also

---

[2] A type of heart fibrillation due to an abnormal spread of the contraction impulse through the tissue of the atrium or auricle. ATTORNEYS' DICTIONARY OF MEDICINE, A-12246 (2009).

[3] Nerve inflammation involving the optic nerve, the nerve which carries the nerve impulses from the retina of the eyeball toward the brain. ATTORNEYS' DICTIONARY OF MEDICINE, O-83902.

indicated that he takes naps due to daytime drowsiness, a side effect of his obstructive sleep apnea

(Docket No. 13, p. 71 of 1088).

### 2.    VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the

hearing, the VE described Plaintiff's past work as a stockbroker as sedentary and as an insurance

salesman as light (Docket No. 13, p. 81 of 1088). ALJ Hill then posed his first hypothetical question:

> I would like you to assume a person closely approaching advanced age, who achieved the
> status of being a person of advanced age [in July 2010] . . . With a high school and above
> education, and the claimant's work history; who can perform light work, but cannot climb
> ladders, ropes, or scaffolds; and can only occasionally climb ramps and stairs. Assume this
> person can occasionally balance, stoop, kneel, crouch, and crawl. Assume this person must
> avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. Assume
> this person cannot perform any job relquiring[sic] depth perception or wide visual fields.
> Assume this person cannot driver[sic] commercially, and must avoid exposure to moving
> machinery and unprotected heights. And by, driving commercially, I mean any job that
> would require him to drive. It's not necessarily having commercial driver's licenses;
> driving as part of the job. Could this person perform any of the claimant's past work?

(Docket No. 13, pp. 81-82 of 1088). The VE indicated that such an individual could perform Plaintiff's

past stockbroker position (Docket No. 13, p. 82 of 1088). The VE testified that there were other jobs in

the national economy that the individual could perform at the light level, including: (1) mail clerk,

listed under DOT[4] 209.687-026, for which there are 160,000 positions nationally and 500 locally; and

(2) sales attendant, listed under DOT 299.677-010, for which there are 120,000 positions nationally

and 600 locally (Docket No. 13, p. 82 of 1088). For his second hypothetical, ALJ Hill restricted the

hypothetical individual to the same limitations but at the sedentary level (Docket No. 13, p. 82 of

1088). Again, the VE indicated that such an individual could perform Plaintiff's past work as a

stockbroker (Docket No. 13, p. 83 of 1088). Other jobs the individual could perform included: (1)

---

[4] Dictionary of Occupational Titles.

receptionist, listed under DOT 237.367-010, for which there are 100,000 positions nationally and 500 locally; and (2) charge account clerk, listed under DOT 205.367-014, for which there are 90,000 positions nationally and 300 locally (Docket No. 13, p. 82 of 1088).

Using the same limitations of his first hypothetical, ALJ Hill then questioned whether restricting the individual to only occasional reading would change the VE's answers (Docket No. 13, p. 83 of 1088). The VE testified that an individual with this limitation would not be able to perform Plaintiff's past work as a stockbroker but could perform the mail clerk position as well as other light work, including: (1) housekeeping cleaner, listed under DOT 323.687-014, for which there are 500,000 positions nationally and 2,000 locally; and (2) food service worker, listed under DOT 311.677-010, for which there are 130,000 positions nationally and 600 locally (Docket No. 13, pp. 83-84 of 1088). The VE testified that there would be no jobs with these same limitations at the sedentary level (Docket No. 13, p. 84 of 1088). ALJ Hill then questioned whether there were any transferable skills from Plaintiff's past job as a stockbroker to the receptionist position (Docket No. 13, p. 84 of 1088). The VE responded in the negative (Docket No. 13, p. 84 of 1088).

During cross-examination, Plaintiff's counsel, using the ALJ's first hypothetical as a basis, questioned whether there would be any jobs available to an individual who also required only minimal contact with the public, coworkers, and supervisors (Docket No. 13, p. 85 of 1088). The VE indicated that there would be no jobs available given those limitations (Docket No. 13, p. 85 of 1088). Counsel also questioned whether there were any positions available for an individual who, in addition to the restrictions set forth in the first hypothetical, would also spontaneously fall asleep two times per day for fifteen to thirty minutes (Docket No. 13, p. 85 of 1088). The VE indicated that such a situation would be unacceptable to most employers (Docket No. 13, p. 85 of 1088).

6

**B.**    **MEDICAL RECORDS**

**1.**    **PHYSICAL HEALTH ISSUES**

Plaintiff's medical records regarding his physical health are extensive and date back to October

1989 when Plaintiff underwent an angioplasty[5] (Docket No. 13, p. 274 of 1088). This procedure was

revised twice within one month after the initial surgery (Docket No. 13, p. 559 of 1088). In 1995,

Plaintiff underwent a coronary endarterectomy[6] (Docket No. 13, p. 559 of 1088). In 1997, Plaintiff had

another angioplasty and stent placement (Docket No. 13, p. 559 of 1088). Plaintiff had additional

stents inserted in 2000 and 2005 (Docket No. 13, pp. 385-86, 559 of 1088). Simultaneous to these

procedures, Plaintiff underwent multiple stress tests (Docket No. 13, pp. 260, 276, 304, 307, 310, 315,

321, 324, 327, 330 of 1088) and was under the care of his primary cardiologist Dr. David A. Hoffman,

DO ("Dr. Hoffman") (Docket No. 13, pp. 263-65, 267-69, 271-73 of 1088).

Plaintiff's records also contain reports from his family medicine physician Dr. Anne Stover,

MD ("Dr. Stover") from June 16, 2009, through June 1, 2010 (Docket No. 13, pp. 593-617 of 1088).

Plaintiff complained of heart problems, shortness of breath, vision issues, severe muscle aches and

fatigue, lumps in his stomach, and tingling on the right side of his body (Docket No. 13, pp. 593-617

of 1088). Dr. Stover provided medication management and began treating Plaintiff for diabetes

(Docket No. 13, pp. 593-617 of 1088). In an evaluation dated August 24, 2006, Dr. Stover reported

that Plaintiff was being treated for hypertensive cardiovascular disease and was experiencing optimal

benefit from his prescribed therapy (Docket No. 13, pp. 335-36 of 1088). By June 2009, Dr. Stover

---

[5] Dilation of a coronary artery to provide a larger channel for flow of blood. ATTORNEYS' DICTIONARY OF MEDICINE, C-28999.

[6] The surgical removal of a part of the intima (innermost layer) of an artery along with a thrombus or atheroma formed on it. ATTORNEYS' DICTIONARY OF MEDICINE, E-39301.

reported that Plaintiff was no longer experiencing optimal benefit from his prescribed therapy (Docket No. 13, p. 350 of 1088).

On June 22, 2009, Plaintiff participated in a stress test which was positive for significant ST depression and showed symptoms of ischemia with stress (Docket No. 13, p. 368 of 1088). Plaintiff was referred for a cardiac catheterization (Docket No. 13, p. 368 of 1088). He underwent this procedure with Dr. Hoffman on June 26, 2009, and Dr. Hoffman recommended further surgical consultation (Docket No. 13, p. 360 of 1088). On July 14, 2009, Plaintiff saw Dr. Patrick L. Whitlow, MD ("Dr. Whitlow") for a surgical evaluation (Docket No. 13, p. 405 of 1088). Dr. Whitlow noted that Plaintiff was intolerant to statin therapy and concluded that "bypass surgery [was] clearly indicated" (Docket No. 13, p. 408 of 1088). Plaintiff was diagnosed with coronary atherosclerosis,[7] diabetes mellitus (type II), hypertension, mixed hyperlipidemia,[8] and sleep apnea (Docket No. 13, p. 408 of 1088). His chest x-ray was normal (Docket No. 13, p. 534 of 1088). On July 17, 2009, using a vein from his left forearm, Plaintiff underwent a four-vessel aortocoronary bypass surgery (Docket No. 13, pp. 466-68, 626-28 of 1088).

Not long after this surgery, Plaintiff began complaining of left arm pain at the incision site (Docket No. 13, pp. 423, 469 of 1088). It was determined that Plaintiff had a methicillin-resistant staphylococcus aureua ("MRSA") infection and he was admitted to the hospital and treated with intravenous antibiotics (Docket No. 13, pp. 424, 429, 430, 472 of 1088). On September 1, 2009, Plaintiff met with Dr. Whitlow complaining of chest pain while in the supine position (Docket No. 13,

_____

[7] The presence of high levels or concentrations of lipids (fats) in the blood. ATTORNEYS' DICTIONARY OF MEDICINE, H-57295.

[8] A disease of the arteries, especially of the medium-size and large arteries, marked by the deposit of patches on and in the inner layer of the artery. ATTORNEYS' DICTIONARY OF MEDICINE, A-12041.

p. 429 of 1088). During this appointment Plaintiff was advised to gradually return to normal full-time activity (Docket No. 13, p. 430 of 1088). During an appointment on October 1, 2009, with infectious disease specialist Dr. Lucileia T. Johnson, MD ("Dr. Johnson"), it was reported that Plaintiff's MRSA infection had cleared (Docket No. 13, pp. 435, 494 of 1088).

In addition to the MRSA infection, Plaintiff also developed a-fib after his 2009 bypass surgery (Docket No. 13, p. 559 of 1088). The a-fib caused Plaintiff to develop blindness in both eyes (Docket No. 13, p. 559 of 1088). Only Plaintiff's right eye recovered (Docket No. 13, p. 559 of 1088). During a December 18, 2009, appointment with Dr. Prabhudas R. Lakhami, MD ("Dr. Lakhami"), it was determined that Plaintiff could not read anything up close and could not read small letters from a far distance (Docket No. 13, p. 559 of 1088). Plaintiff could read large letters from a distance of six feet (Docket No. 13, p. 559 of 1088). Plaintiff's right eye visual acuity was 20/200 without glasses but 20/20 with glasses (Docket No. 13, p. 561 of 1088). In April 2010, Plaintiff began treatment with opthamologist Dr. H.S. Wang, MD ("Dr. Wang") (Docket No. 13, p. 583 of 1088).

On June 1, 2010, Plaintiff saw Dr. Michael T. Engle, MD ("Dr. Engle") complaining of right-sided neck and arm pain (Docket No. 13, p. 619 of 1088). Dr. Engle noted that Plaintiff had normal thoracic and lumbar alignment, good range of motion in his lumbar spine without pain, full bilateral shoulder range of motion without signs of impingement or pain, and full strength (Docket No. 13, p. 619 of 1088). Plaintiff also had increasing pain upon cervical flexion and extension (Docket No. 13, p. 619 of 1088). Plaintiff was diagnosed with a cervical sprain/strain and was referred to focused cervical physical therapy (Docket No. 13, p. 620 of 1088). On June 3, 2010, Plaintiff saw physical therapist Aby Chismar ("Ms. Chismar") and reported that his shoulder pain ranged from a two to an eight out of a possible ten (Docket No. 13, p. 622 of 1088). Ms. Chismar noted that Plaintiff had a minimally

9

limited range of motion in all directions and recommended that Plaintiff be seen two to three times per week for four weeks (Docket No. 13, p. 623 of 1088).

Plaintiff returned to Dr. Wang on June 21, 2010 (Docket No. 13, p. 581 of 1088). At that time, Dr. Wang noted that Plaintiff's visual acuity, with best correction, was 20/20 in his right eye and 20/150 in his left eye (Docket No. 13, p. 581 of 1088). On July 8, 2010, Dr. Wang concluded that Plaintiff had poor binocular vision and moderate visual impairment in his left eye and, as such, should avoid heights and hazardous machinery (Docket No. 13, p. 582 of 1088).

On December 9, 2010, Plaintiff saw Dr. Francisco A. Mateo, MD ("Dr. Mateo") for a consultation for possible sleep apnea (Docket No. 13, p. 893 of 1088). Plaintiff complained of daytime hypersomnolence associated with snoring and obesity (Docket No. 13, p. 893 of 1088). Plaintiff was referred for a sleep study (Docket No. 13, p. 893 of 1088). Results showed that Plaintiff had severe obstructive sleep apnea that was corrected with continuous positive airway pressure ("CPAP") titrated at nine centimeters of water pressure (Docket No. 13, p. 896 of 1088). On January 12, 2011, Plaintiff established care with Dr. Shreebatsa Dhital, MD ("Dr. Dhital") (Docket No. 13, p. 706 of 1088). Plaintiff was instructed to wear his CPAP device and watch his diet (Docket No. 13, p. 688 of 1088). Plaintiff was also referred to the Turning Point Counseling Center ("Turning Point") (Docket No. 13, p. 688 of 1088).

On March 23, 2011, Plaintiff reported to the St. Elizabeth Ambulatory Care Clinic where it was determined that he had a very faint systolic murmur (Docket No. 13, p. 700 of 1088). Plaintiff was referred back to his cardiologist (Docket No. 13, p. 700 of 1088). On July 1, 2011, Plaintiff presented to the St. Elizabeth Health Center Emergency Room complaining of chest discomfort that had lasted three to four days (Docket No. 13, p. 711 of 1088). Records show that Plaintiff admitted to walking

10

three miles that day without any chest discomfort, and Plaintiff was diagnosed with chest pain,

"probably non-cardiac" (Docket No. 13, pp. 711, 714 of 1088). A chest x-ray showed no acute

cardiopulmonary disease (Docket No. 13, p. 719 of 1088). Plaintiff was reminded of the importance of

using his CPAP machine and was also advised to lose weight (Docket No. 13, p. 714 of 1088). On July

14, 2011, as a result of complaints of blurred vision and altered mental status, Plaintiff underwent a

brain MRI (Docket No. 13, p. 828 of 1088). The study was unremarkable (Docket No. 13, p. 828 of

1088).

     Around this same time, Plaintiff began seeing Dr. Scott B. Tofil ("Dr. Tofil") for management

of his diabetes (Docket No. 13, pp. 820-57 of 1088). Plaintiff followed up with Dr. Tofil on a regular

basis for blood sugar checks and medication management (Docket No. 13, pp. 820-57 of 1088). At that

time, Plaintiff indicated that he was walking two to three miles per day, four to five days per week and

engaging in a light weight-lifting routine (Docket No. 13, p. 821 of 1088).

     On September 26, 2011, Plaintiff was sent for a consultation with Dr. Robert Brocker, Jr., MD

("Dr. Brocker") (Docket No. 13, p. 983 of 1088). Plaintiff complained of a right-sided tic (Docket No.

13, p. 983 of 1088). A neurological examination was suggestive of some focal dystonia of the cervical

musculature and possible cervical radiculopathy, but was otherwise normal (Docket No. 13, pp. 984-85

of 1088). Plaintiff was diagnosed with dystonia[9] and cervical radiculopathy and Dr. Brocker

recommended conservative treatment (Docket No. 13, p. 985 of 1088). Plaintiff returned to Dr.

Brocker on November 15, 2011, complaining of numbness and tingling on the bottoms of his feet

(Docket No. 13, p. 885 of 1088). A cervical MRI showed bulging of the majority of the discs in

_____

[9] An abnormal condition of the tonus of the muscles. ATTORNEYS' DICTIONARY OF MEDICINE, D-37219.

Plaintiff's neck, but these changes were described as non-surgical in nature (Docket No. 13, p. 886 of 1088). Plaintiff was diagnosed with cervical disc displacement, cervical radiculopathy, and dystonia (Docket No. 13, p. 886 of 1088).

### 2. MENTAL HEALTH ISSUES

Plaintiff's mental health issues date back to June 30, 2006, when Plaintiff first saw Charles Boris, ACSW, LISW ("Mr. Boris") at the Center for Behavioral Health (Docket No. 13, p. 861 of 1088). Plaintiff claimed to be "extremely depressed" as a result of his recent job termination and reported sleep difficulties, dysphoric mood, crying episodes, weight loss/gain, and reduced sexual drive (Docket No. 13, pp. 861, 866-67 of 1088). During the evaluation, Mr. Boris found Plaintiff to be appropriately focused and cheerful, but also anxious, depressed, and euphoric with rapid, loud, and emotional speech and a dramatized affect (Docket No. 13, p. 867 of 1088). Plaintiff had mildly impaired insight and judgment but presented with a logical thought process (Docket No. 13, pp. 867-68 of 1088). Plaintiff presented as very engaging and happy but with a sense of entitlement and gave little thought to the consequences of his behavior (Docket No. 13, p. 870 of 1088). Mr. Boris assigned Plaintiff a Global Assessment of Functioning[10] ("GAF") score of fifty-five (Docket No. 13, p. 870 of 1088).

Plaintiff returned to Mr. Boris seven times over the next six months (Docket No. 13, pp. 345, 871-77 of 1088). Plaintiff continued to express strong feelings of anger over what he referred to as an unjustified termination (Docket No. 13, pp. 345, 871 of 1088). On October 17, 2006, Mr. Boris noted

---

[10] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of fifty-five indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

that Plaintiff was "very capable of working" (Docket No. 13, p. 345 of 1088). Mr. Boris also noted that

Plaintiff was capable of residing alone, got along well with family, friends, and neighbors, and could

prepare food, do household chores, shop, drive, and manage his finances (Docket No. 13, p. 345 of

1088). On November 28, 2006, Plaintiff reported taking Lexapro with good therapeutic benefit

(Docket No. 13, p. 874 of 1088). Mr. Boris increased Plaintiff's dosage of Lexapro on December 20,

2006, after Plaintiff complained of feelings of hopelessness, extreme feelings of anxiousness, and

being unable to sleep (Docket No. 13, p. 875 of 1088). Mr. Boris noted that Plaintiff was experiencing

more anxiety than clinical depression (Docket No. 13, p. 875 of 1088). By January 17, 2007, Plaintiff

reported that he was doing extremely well and working several part-time jobs (Docket No. 13, p. 876

of 1088).  Plaintiff failed to show for his last session on February 7, 2007 (Docket No. 13, p. 877 of

1088).

Plaintiff's mental health records then jump four years to February 7, 2011, when Plaintiff

began treatment at Turning Point (Docket No. 13, p. 1035 of 1088). Plaintiff reported being a victim of

physical and verbal abuse at his last job and claimed he was terminated because he was Jewish (Docket

No. 13, p. 1035 of 1088).[11] Plaintiff alleged that he was physically and mentally unable to work but

noted that he could participate in social and church activities (Docket No. 13, pp. 1035-36 of 1088).

Staff at Turning Point noted that Plaintiff had average intelligence and usually had good insight and

judgment, although these could be questionable at times (Docket No. 13, p. 1047 of 1088). Plaintiff

was diagnosed with dysthymic disorder and cognitive disorder not otherwise specified ("NOS") and

---

[11] It should be noted that Plaintiff admitted to converting to Christianity in 1998 (Docket No. 13,
p. 1036 of 1088).

13

assigned a GAF score of forty[12] (Docket No. 13, p. 1044 of 1088).

Plaintiff returned to Turning Point somewhat consistently until March 23, 2012 (Docket No. 13, pp. 1050-63 of 1088). Plaintiff remained frustrated with his job situation (Docket No. 13, pp. 1056, 1060-61 of 1088) and reported difficulty sleeping (Docket No. 13, pp. 1056, 1058-59 of 1088). During an August 15, 2011, appointment, Plaintiff indicated that he had been hired by Merrill Lynch but ultimately did not pass the background check (Docket No. 13, pp. 1055-56 of 1088). On August 29, 2011, staff at Turning Point reported that Plaintiff seemed to have taken a step backward with regard to his progress (Docket No. 13, p. 1055 of 1088). However, by September 26, 2011, Plaintiff reported that he felt as though he could handle working (Docket No. 13, p. 1053 of 1088). This progress continued until November 18, 2011, when Plaintiff reported an increase in depressive symptoms after discovering that his girlfriend was having an affair (Docket No. 13, p. 1050 of 1088). Plaintiff's file with Turning Point was closed on March 23, 2012 (Docket No. 13, p. 1064 of 1088).

Plaintiff saw Dr. Lynn DiMarzio ("Dr. DiMarzio") at the Copley Counseling Center from January 11, 2012, through March 28, 2012 (Docket No. 13, pp. 952-70 of 1088). During a self-evaluation, Plaintiff reported, among other things, feeling sad, discouraged, worthless, and guilty, as well as crying spells, having decreased interest, and being restless (Docket No. 13, pp. 956-57 of 1088). Dr. DiMarzio assigned Plaintiff a GAF score of fifty-two[13] (Docket No. 13, p. 970 of 1088).

On May 17, 2012, Plaintiff presented to the Humility of Mary Health Partners psychiatric unit after an alleged overdose of Trazodone (Docket No. 13, pp. 1075, 1080 of 1088). Plaintiff had texted

---

[12] A score of forty indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV at 34.

[13] A score of fifty-two indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

14

his daughter saying that he felt overwhelmed and wanted to kill himself (Docket No. 13, p. 1080 of 1088). Plaintiff was assigned a GAF score of twenty-three[14] and was admitted into an inpatient psychiatric program with a predicted length of stay of three to five days (Docket No. 13, p. 1083 of 1088). Plaintiff saw Dr. DiMarzio again on June 19, 2012 (Docket No. 13, p. 1085 of 1088). Dr. DiMarzio noted that Plaintiff was compliant with treatment and was being treated for major depressive disorder (recurrent), ranging from moderate to severe (Docket No. 13, p. 1085 of 1088). Dr. DiMarzio noted that Plaintiff had periods where he was confused and had difficulty with executive functioning, short and long-term memory, and concentration (Docket No. 13, p. 1085 of 1088).

## C.  EVALUATIONS

### 1.  FIRST PSYCHOLOGICAL EVALUATION

On October 9, 2006, Plaintiff underwent a psychological evaluation with Dr. J. Joseph Konieczny, Ph.D ("Dr. Konieczny") at the request of the Board of Disability Determination ("BDD") (Docket No. 13, pp. 338-41 of 1088). Plaintiff was pleasant and cooperative throughout the evaluation (Docket No. 13, p. 338 of 1088). He showed no signs of undue impulsivity, denied any difficulty with controlling anger, reported occasional episodes of mood swings, and described his overall level of motivation as variable (Docket No. 13, p. 339 of 1088). Plaintiff reported difficulties with sleep and recent feelings of depression (Docket No. 13, p. 339 of 1088). He denied any crying episodes or thoughts of suicide (Docket No. 13, p. 339 of 1088). Plaintiff had no feelings of guilt and showed no indications of nervousness or anxiety (Docket No. 13, p. 339 of 1088).

Dr. Konieczny noted that Plaintiff spoke well with no looseness of associations, tangentiality,

---

[14] A score of twenty-three indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. DSM-IV at 34.

or poverty of speech (Docket No. 13, p. 339 of 1088). Plaintiff was capable of expressing himself in a clear and coherent manner (Docket No. 13, p. 339 of 1088). He had an adequate ability to concentrate and attend to tasks at hand, understand, and follow directions (Docket No. 13, p. 340 of 1088). Dr. Konieczny reported that Plaintiff's ability to withstand stress and pressure was moderately impaired, but his ability to relate to others, including the general public, was adequate (Docket No. 13, p. 340 of 1088). Plaintiff's insight was fair and he displayed an adequate degree of awareness of rules of social judgment and conformity (Docket No. 13, p. 340 of 1088). His judgment was adequate and his overall level of functioning was at a slightly reduced level of efficiency (Docket No. 13, p. 341 of 1088). Dr. Konieczny diagnosed Plaintiff with depressive disorder NOS and assigned him a GAF score of fifty-four[15] (Docket No. 13, p. 341 of 1088).

##    2.    SECOND PSYCHOLOGICAL EVALUATION

Plaintiff underwent a second psychological evaluation on October 21, 2009, with Dr. Kenneth Gruenfeld, Psy.D ("Dr. Gruenfeld") (Docket No. 13, pp. 538-43 of 1088). Plaintiff reported symptoms of sadness, lethargy, and lack of motivation (Docket No. 13, p. 539 of 1088). He was cooperative during the evaluation and had good task motivation, persistence, attention, concentration, and response (Docket No. 13, p. 540 of 1088). Plaintiff's speech was normal and his conversation was logical and topic-directed with some spontaneous elaboration (Docket No. 13, p. 540 of 1088). Dr. Gruenfeld noted that Plaintiff's affect was appropriate and that Plaintiff appeared sad during some portions of the interview and animated during others (Docket No. 13, p. 540 of 1088). Plaintiff had no loosening of association or ideas of reference and there was no evidence of grandiosity, religiosity, or paranoid

---

[15] A score of fifty-four indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

16

thoughts (Docket No. 13, p. 540 of 1088). He was oriented to person, place, and time, and displayed some insight and judgment into both his medical treatment and planning for the future (Docket No. 13, p. 541 of 1088).

With regard to his work-related mental abilities, Dr. Gruenfeld concluded that Plaintiff had: (1) mild impairment in his ability to relate to others; (2) no impairment in his ability to understand and follow instructions; (3) mild impairment in his ability to maintain attention, especially in the areas of concentration, persistence, and pace; and (4) mild impairment in his ability to withstand the stress and pressure associated with day-to-day work activity (Docket No. 13, p. 542 of 1088). Dr. Gruenfeld diagnosed Plaintiff with adjustment disorder with depressed mood and assigned him a GAF score of fifty-five[16] (Docket No. 13, p. 543 of 1088).

### 3.    PSYCHIATRIC REVIEW TECHNIQUE

On November 3, 2009, Plaintiff underwent a Psychiatric Review Technique with state examiner Dr. Alice Chambly, Psy.D ("Dr. Chambly") (Docket No. 13, pp. 545-58 of 1088). Dr. Chambly concluded that Plaintiff suffered from an adjustment disorder with depressed mood (Docket No. 13, p. 548 of 1088). With regard to "Paragraph B"[17] criteria, Dr. Chambly found Plaintiff had a mild degree of limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace, with no episodes of decompensation (Docket No. 13, p. 555 of 1088). Dr. Chambly found no evidence of "Paragraph C"[18] criteria (Docket No. 13, p. 556 of 1088).

---

[16] A score of fifty-five indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

[17] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[18] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A)

### 4. PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On February 11, 2010, Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner Dr. Gary Hinzman, MD ("Dr. Hinzman") (Docket No. 13, pp. 568-75 of 1088). Dr. Hinzman found Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for a total of six hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in unlimited pushing and pulling (Docket No. 13, p. 569 of 1088). With regard to postural limitations, Dr. Hinzman concluded that Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl and never climb ladders, ropes, or scaffolds (Docket No. 13, p. 570 of 1088). Plaintiff had limited depth perception and field of vision and was advised to avoid even moderate exposure to hazards such as machinery and heights (Docket No. 13, pp. 271-72 of 1088). Plaintiff had no manipulative or communicative limitations (Docket No. 13, p. 572 of 1088).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C.F.R. § 404.1520. DIB is available only for those who have a "disability." 42 U.S.C. § 423(a), (d). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he

seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. § 404.1520(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the

19

Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730

(*citing* 20 C.F.R. § 404.1520(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Hill made the

following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

2. Plaintiff engaged in substantial gainful activity during the following periods: 2006, 2008, and 06/2009 to 07/2009.

3. There has been a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity. The remaining findings address the period Plaintiff did not engage in substantial gainful activity.

4. Plaintiff has the following severe impairments: coronary artery disease, diabetes, diabetic retinopathy, obstructive sleep apnea, cervical disc displacement, and loss of vision in the left eye.

5. Plaintiff does not have an impairment or combination of impairments that meet or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

6. Plaintiff has the residual functional capacity to perform light work with the following additional limitations: (1) no climbing of ladders, ropes, or scaffolds; (2) occasionally climbing ramps and stairs; (3) occasionally balance, stoop, kneel, crouch, and crawl; (4) avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; (5) no job requiring depth perception of wide visual fields; (6) no commercial driving; and (7) avoid exposure to moving machinery and unprotected heights.

7. Plaintiff is capable of performing past relevant work as a stockbroker.

8. Plaintiff has not been under a disability, as defined in the Social Security Act, from May 10, 2006, through the date of this decision.

(Docket No. 13, pp. 27-37 of 1088). ALJ Hill denied Plaintiff's request for DIB (Docket No. 13, p. 37 of

1088).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

The undersigned magistrate construes Plaintiff's  two-fold argument as follows. First, given Plaintiff's actual exertional and non-exertional impairments, Plaintiff is unable to return to his past relevant work as a stockbroker. While other work may or may not be available, depending on the assigned work level, Plaintiff does not have any transferable skills. Given these two factors, as well as

21

Plaintiff's advanced age, Plaintiff necessarily "grids out" under the Medical-Vocational Guidelines (Docket No. 14). In the alternative, the ALJ failed to present a complete hypothetical question to the VE (Docket No. 14).

## B.   DEFENDANT'S RESPONSE

Defendant disagrees and argues that the ALJ's hypothetical question was based on substantial evidence (Docket No. 17).

## C.   DISCUSSION

### 1.   ONSET DATE

As an initial matter, there seems to be some discrepancy over Plaintiff's actual disability onset date. In Plaintiff's application for DIB, he listed his onset date as May 10, 2006 (Docket No. 13, p. 126 of 1088). However, a review of Plaintiff's work history reveals that Plaintiff was actually gainfully employed in 2006, 2008, and part of 2009 (Docket No. 13, p. 145 of 1088). Social Security Regulations preclude a finding of disability, regardless of impairment, age, education, or work experience, if the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). *Any* work done during a period of alleged disability may show that a claimant can engage in substantial gainful activity. 20 C.F.R. § 404.1571. The Regulations state that earnings are generally the primary factor in determining if a claimant's work constitutes substantial gainful activity. *See Oaks v. Astrue*, 2012 U.S. Dist. LEXIS 25152, *24 (N.D. Ohio 2012) (*citing* 20 C.F.R. § 404.1574). "A claimant who earns more than a specific amount prescribed by the guidelines set forth in the regulations is presumed to have engaged in [substantial gainful activity]." *Oaks*, 2012 U.S. Dist. LEXIS 25152 at *24 (*citing* 20 C.F.R. § 404.1574(b)(2)(ii)(B); *see also Tyra v. Sec'y of Health and Human Servs.*, 896 F.2d 1024, 1029 (6th Cir. 1990)). For the time periods relevant to the case at hand, the amounts necessary to

22

create this presumption are $860 per month in 2006, $940 per month in 2008, and $970 per month in 2009. *See* 20 C.F.R. § 404.1574(b)(2)(ii)(B).

Here, Plaintiff earned approximately $4,391 per month in 2006, $2,997 per month in 2008, and $3,823 per month for the time worked in 2009. ALJ Hill, Plaintiff's counsel, and Plaintiff discussed Plaintiff's actual onset date at length during the administrative hearing (Docket No. 13, pp. 52-57 of 1088). Plaintiff admitted that he worked in 2006, 2008, and part of 2009, and testified that he had not worked since May 2, 2009 (Docket No. 13, pp. 52-53 of 1088). It then appears that ALJ Hill and Plaintiff's counsel agreed to amend the alleged onset date to May 2, 2009 (Docket No. 13, p. 53 of 1088). However, on May 1, 2012, just three days before ALJ Hill issued his written decision, Plaintiff filed an official Motion to Amend his alleged onset date to January 1, 2009 (Docket No. 13, p. 151 of 1088). Given Plaintiff's 2009 earned income of $15,294.49 (Docket No. 13, p. 150 of 1088), and his testimony that he had not worked since May 2, 2009 (Docket No. 13, p. 53 of 1088), it is logical to conclude that Plaintiff earned this sum *prior to* May 2, 2009. Therefore, Plaintiff seemingly engaged in substantial gainful activity from January 1, 2009, through May 1, 2009, effectively preventing Plaintiff from alleging disability during this time. The Magistrate therefore finds Plaintiff's onset date to be May 2, 2009.[19]

The Magistrate is aware that in his written decision ALJ Hill concludes that Plaintiff has not been under a disability any time from May 10, 2006, through the date of his decision, May 4, 2012 (Docket No. 13, p. 37 of 1088). However, as explained above, Plaintiff could not have been under a

---

[19] During the administrative hearing, Plaintiff argued that his earnings were from an annuity established by his daughter (Docket No. 13, pp. 53-54, 56-57 of 1088). Plaintiff also claimed the income was from a "straight commission job" (Docket No. 13, p. 553 of 1088). There is no evidence in the record to substantiate either of these claims.

disability, at least as that term is defined under Social Security Regulations, any time before May 2, 2009. Indeed, ALJ Hill discusses Plaintiff's substantial gainful activity in 2006, 2008, and 2009 in his opinion (Docket No. 13, p. 29 of 1088). It is unclear as to why the ALJ did not therefore formally amend Plaintiff's alleged onset date to the date discussed during the administrative hearing. However, by discussing Plaintiff's potential disability from May 10, 2006, ALJ Hill necessarily includes in his decision the more relevant time period between May 2, 2009, and May 4, 2012. Therefore, the Magistrate finds any error in the alleged onset date to be harmless.

### 2.    MEDICAL-VOCATIONAL GUIDELINES

According to Plaintiff, given his combination of exertional and non-exertional limitations, he is unable to return to his past work as a stockbroker. This testimony, therefore.  requires the ALJ to either find Plaintiff capable of performing other work in the national economy or find Plaintiff to be disabled. Plaintiff argues that he is unable to do other work in the national economy, given his advanced age of fifty-eight and his lack of transferable skills (Docket No. 14). Therefore, Plaintiff should statutorily "grid out" under the Medical-Vocational Guidelines and be found disabled (Docket No. 14). Plaintiff's argument is without merit.

The Medical-Vocational Guidelines, more commonly known as "the Grid," "direct[] a conclusion of 'disabled' or 'not disabled' based on the claimant's age and education and whether the claimant has transferable work skills." *Wilson*, 378 F.3d at 548 (*citing Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003)). As a general rule, an ALJ "may not rely on the grids alone to meet [his] step-five burden where the evidence shows that a claimant has *nonexertional* impairments that preclude the performance of a full range of work at a given level." *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990) (emphasis added). Additionally, if the claimant suffers from *both* exertional and

24

non-exertional impairments, the Grid may be used only as a *framework* to provide guidance for decision-making, not to direct a conclusion of disability. *Id.* "Rote application of the grid is inappropriate." *Id.* at 926. An ALJ can only treat the Grid as a framework in these cases and "must rely on other evidence to determine whether a significant number of jobs exist in the national economy that a claimant can perform."*Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th Cir. 2008) (*citing Burton v. Sec'y of Health and Human Servs.*, 893 F.2d 821, 822 (6th Cir. 1990)). This other evidence includes the testimony of a VE. *See Born v. Sec'y of Health and Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990).

A limitation is classified as exertional if it affects a claimant's "ability to meet the strength demands of the jobs." 20 C.F.R. § 1569a(a). "Limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." 20 C.F.R. § 404.1569a(a). This includes limitations involving the ability to "reach; to seize, hold, grasp, or turn an object (handle); to bend the legs alone (kneel); to bend the spine alone (stoop) or bend both the spine and legs (crouch)." 1985 SSR LEXIS 20, *5. Non-exertional limitations also include fine movements of small objects, or those that require the use of fingers to pick or pinch, and any impairment of vision, speech, or hearing. *Id.* at *6.

Here, ALJ Hill found Plaintiff to have *only* non-exertional limitations, namely: (1) no climbing of ladders, ropes, or scaffolds; (2) occasional climbing of ramps and stairs; (3) occasional balancing, stooping, kneeling, crouching, and crawling; (4) no exposure to fumes, odors, dusts, gases, and poor ventilation; (5) no job requiring depth perception of wide visual fields; (6) no commercial driving; and (7) no exposure to moving machinery and unprotected heights (Docket No. 13, p. 32 of 1088). Given

the presence of these non-exertional limitations, ALJ Hill was therefore required to use other evidence, namely the VE's testimony, to determine Plaintiff's work abilities. *Abbott*, 905 F.2d at 926-27.

Furthermore, it is worth noting that although Plaintiff seeks to "grid out", he *simultaneously* seeks the inclusion of additional non-exertional limitations into Plaintiff's residual functional capacity (Docket No. 14, pp. 5-8 of 10). The law is clear: when a claimant has only non-exertional limitations, or a combination of exertional and non-exertional limitations, the Grid may be used *only* as a framework to provide guidance, *not* for a direct conclusion of disability. *Abbott*, 905 F.2d at 926-27. Plaintiff cannot argue simultaneously for strict application of the Grid *and* the inclusion of additional non-exertional limitations. Therefore, Plaintiff's assignment of error is without merit and the Magistrate recommends that the decision of the Commissioner be affirmed.

### 3.  HYPOTHETICAL QUESTION

As an alternative argument, Plaintiff seems to contend  that ALJ Hill erred in determining that Plaintiff can return to his past relevant work as a stockbroker (Docket No. 14, pp. 5-8 of 10). This erroneous determination, Plaintiff argues, is the direct result of an improper and incomplete hypothetical question (Docket No. 14, pp. 5-8 of 10). Defendant disagrees and argues that the ALJ's hypothetical question was complete and based on substantial evidence (Docket No. 17, pp. 9-12 of 14).

In the Sixth Circuit, a VE's testimony must be based on a hypothetical question which accurately portrays the claimant's physical and mental impairments. *See Varley v. Sec'y of Health & Human Servs*., 820 F.2d 777, 779 (6th Cir. 1987). This evidence may only be used as substantial evidence of a claimant's residual functional capacity when that testimony is in response to a hypothetical question that "accurately portrays [the claimant's] individual physical and mental impairments." *Davis v. Sec'y of Health & Human Servs.*, 915 F.2d 186, 189 (6th Cir. 1990). However,

26

it is also "well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, Plaintiff seems to take issue with the fact that the ALJ chose not to include in his hypothetical questions the limitations of occasional reading or minimal contact with the public, coworkers, and supervisors (Docket No. 14). However, a review of the administrative hearing reveals that ALJ Hill, as well as Plaintiff's own counsel, included these limitations in their hypothetical questions.

After ALJ Hill's first hypothetical, he gave the VE the following instruction: "[n]ow, I'd like you to assume the individual described in hypothetical number one cannot perform any work that requires more than occasional reading. Could this person perform any of the claimant's past work?" (Docket No. 13, p. 83 of 1088). During his cross-examination, Plaintiff's counsel questions if, using the factors set forth in the ALJ's original hypothetical, "if we added the hypothetical that the claimant should only have minimal contact with the public, coworkers, and supervisors, would that hypothetical individual be able to perform the types of jobs . . . in your answer to the original hypothetical number one?" (Docket No. 13, p. 85 of 1088).

It should be noted  that Plaintiff admits, in his own Brief on the Merits, that the ALJ and counsel included these limitations in their hypothetical questions:

> It is respectfully submitted that the Record does not support the A.L.J.'s hypothetical questioning as the A.L.J. failed to include <u>any</u> non-exertional impairments in his hypothetical question.

The A.L.J.'s own subsequent hypothetical eroded that line of questioning:

> Q Stockbroker. Now, I'd like you to assume the individual described in hypothetical number one cannot perform any work that requires more than

27

occasional reading. Could this person perform any of the claimant's past work?

A No, Your Honor.

. . .

Q What if the person was now limited to sedentary work, with the limitations in hypo number one, and limitations about the reading?

A I believe the sedentary job market would be eroded with that limitation, Your Honor.

As it was, more importantly, with counsel's hypothetical to the V.E.:

Q Mr. Burkhammer, I won't have as many questions for you, but just, if we kept the hypothetical factors of the Judge's initial hypothetical number the same, and if we added the hypothetical that the claimant should only have minimal contact with the public, coworkers, and supervisors, would that hypothetical individual be able to perform the types of jobs you gave to us in the – in your answer to the original hypothetical number one?

A No.

(Docket No. 14, p. 7 of 10).  Consequently, Plaintiff's argument that the  hypothetical was incomplete lacks merit.

In the alternative, the Court construes Plaintiff argument to contend that, despite the thoroughness of the hypothetical questions, the ALJ failed to set forth a proper assessment of Plaintiff's *residual functional capacity*. While it is true that ALJ Hill did not include in his residual functional capacity assessment any limitation on Plaintiff's ability to read or interact with others, this is likely because such limitations are not supported by the evidence of record, making any such argument without merit.

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations,

residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *16; *see also* 20 C.F.R. § 404.1545(a).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 404.1545(a)(3). The Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 404.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 404.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

First, it should be noted that the issue with Plaintiff's reading is not related to his ability *to* read; rather, it deals with Plaintiff's vision and his alleged inability to sufficiently *see* to read. Plaintiff testified that, in 2009, following his quadruple bypass surgery, he experienced a-fib whereby two blood clots lodged behind his optic nerve and impaired his vision (Docket No. 13, pp. 68-69 of 1088). Plaintiff stated that these clots essentially rendered him blind in his left eye, leaving him only able to see shadows (Docket No. 13, p. 69 of 1088). Plaintiff admitted that the blood clots did not affect the vision in his right eye as severely, but further testified as follows:

> Okay, the first problem I have is, I can't read. I can see pictures . . . And I can see big print . . . I cannot read like 12 point, okay? I have to take a computer . . . and I have to blow it

29

up like literally the size – pardon me for describing it like this, but the size of the cat in the hat . . .. So – and it's embarrassing, because it's literally kept me from being able to read. I used to love to read. I had to drop out of the choir, because I can't do choir anymore . . . I will go through – I'll be, like, fine, where I can, you know, at least, like I said, see perfectly fine. And, I mean, this has been really embarrassing. Three days, four days, I'm fine; then, I'll have periods that last anywhere from maybe 10 seconds to, and it's lasted sometimes as long as four or five hours, most of the time, it's been brief, however, where I've been completely, totally blind.

(Docket No. 13, pp. 69-70 of 1088). Plaintiff also indicated that he can watch television with some difficulty, tries to read, and has floaters in his eyes (Docket No. 13, pp. 72-73, 78-79 of 1088).

ALJ Hill acknowledged Plaintiff's vision difficulties and noted that Dr. Wang, Plaintiff's opthamologist, concluded that Plaintiff would have poor binocular vision and moderate vision restrictions in his left eye (Docket No. 13, pp. 34, 582 of 1088). However, Dr. Wang, whose opinion the ALJ assigned great weight, only suggested that Plaintiff avoid heights and hazardous machinery (Docket No. 13, pp. 34, 582 of 1088). On June 21, 2010, Dr. Wang concluded that Plaintiff's right eye visual acuity, with correction, was 20/20 (Docket No. 13, p. 581 of 1088). Similarly, state examiner Dr. Hinzman advised Plaintiff to avoid heights, hazardous machinery, and commercial driving (Docket No. 13, pp. 34, 572 of 1088), but noted that Plaintiff had unlimited near acuity, far acuity, accommodation, and color vision (Docket No. 13, p. 571 of 1088). In December 2009, Dr. Lakhami noted that Plaintiff's right eye visual acuity, with correction, was 20/20, and Plaintiff was able to read large letters from six feet away (Docket No. 13, pp. 35-36, 559-61 of 1088). Neither Drs. Wang, Hinzman, or Lakhami concluded that Plaintiff would have difficulty reading. In fact, *no* physician ever articulated that conclusion (Docket No. 13, pp. 246-1088 of 1088).

Furthermore, Plaintiff indicated that he has a driver's license and still drives short distances (Docket No. 13, p. 51 of 1088). In June 2010, Plaintiff indicated difficulty with his eyesight but also stated that he was assisting in writing a book (Docket No. 13, pp. 207-13 of 1088). In August 2011,

30

Plaintiff told staff at Turning Point that he had been hired at Merrill Lynch (Docket No. 13, p. 1056 of 1088) but was not ultimately hired because he could not pass the background check (Docket No. 13, p. 1055 of 1088). A May 2012 statement from Plaintiff's pastor indicated that Plaintiff

> has on occasion been our Sunday worship liturgist, greeting the congregation from the lectern, making announcements, leading it in prayer, and reading the two Scripture lessons . . . On Sunday, April 22, 2012, [Plaintiff] was again our liturgist. While reading the Old Testament passage he suddenly stopped for a period of about 15 seconds. He managed to compose himself and to continue the reading. Later he explained to me that for those 15 second he simply could not see - at all.

(Docket No. 13, p. 239 of 1088). Plaintiff's girlfriend indicated that Plaintiff still watches television, plays cards, bowls, and golfs (Docket No. 13, p. 219 of 1088).

Undoubtedly,  Plaintiff experiences vision difficulties. However, based on the evidence of record, ALJ Hill concluded that these vision issues did not impair Plaintiff's ability to read. A review of the record reveals that the ALJ's assessment is, in fact, based on substantial evidence. The findings of the ALJ are conclusive as long as they are based on substantial evidence. *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). Furthermore,"[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton*, 246 F.3d at 772). Therefore, ALJ Hill was proper in not including this limitation in Plaintiff's final residual functional capacity and the Magistrate recommends that the decision of the Commissioner be affirmed.

Similarly, the evidence does not support a restriction limiting Plaintiff to minimal contact with coworkers, supervisors, and the general public. Plaintiff has a girlfriend (Docket No. 13, pp. 36, 70 of 1088) and spends a great deal of time with his children (Docket No. 13, pp. 31, 208 of 1088). Plaintiff indicated that he gets together with friends one to two times per week, goes to church weekly, and

31

attends parties twice per month (Docket No. 13, pp. 31, 211, 239 of 1088). During an appointment with Mr. Boris in 2006, it was noted that Plaintiff got along well with family, friends, and neighbors and visited them on a weekly basis (Docket No. 13, p. 345 of 1088). In February 2011, Plaintiff reported to staff at Turning Point that he participated in church and social activities (Docket No. 13, p. 1036 of 1088). Plaintiff stated that he was even a member of his church board (Docket No. 13, p. 698 of 1088).

Plaintiff underwent two psychological evaluations, neither of which revealed Plaintiff's need to have only minimal contact with others (Docket No. 13, pp. 338-41, 538-43 of 1088). Dr. Konieczny noted that Plaintiff's ability "to relate to others and to deal with the general public generally seems quite adequate" (Docket No. 13, p. 340 of 1088). In 2009, Dr. Gruenfeld concluded that Plaintiff would have only mild impairment with regard to relating to others, including coworkers and supervisors (Docket No. 13, p. 542 of 1088). Similarly, during a Psychiatric Review Technique, Dr. Chambly reported that Plaintiff had only mild difficulties in maintaining social functioning (Docket No. 13, p. 555 of 1088).

Given the objective medical evidence of record, there is no substantial evidence supporting Plaintiff's limitation to minimal contact with coworkers, supervisors, or the general public. As such, the Magistrate recommends that the decision of the Commissioner be affirmed.

## VIII. CONCLUSION

For the foregoing reasons, the Magistrate recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   December 31, 2013

32

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.

33